[Cite as *In re R.T.*, 2025-Ohio-1829.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE R.T.                                          :

A Minor Child                                       :                    No. 114248

[Appeal by X.A., Grandmother]          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 22, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD18905464

---

### *Appearances:*

Susan J. Lax, RN, MS, LLC and Susan J. Lax, *for appellant*
X.A.

Rachel A. Kopec, *for appellee* E.H.

EILEEN A. GALLAGHER, A.J.:

{¶ 1} X.A. appeals the juvenile court's journal entry terminating her legal custody of her granddaughter R.T. and granting legal custody of R.T. to the child's mother E.H. For the following reasons, we affirm the juvenile court's judgment.

## I. Facts and Procedural History

{¶ 2} R.T. was born on April 18, 2018, to E.H. and T.T. On April 26, 2018, the Cuyahoga County Department of Children and Family

Services filed a complaint alleging that R.T. was dependent. X.A., the paternal grandmother of R.T., was granted temporary custody of R.T. on September 5, 2018, and she was granted legal custody of R.T. on May 13, 2019. In 2020, E.H. and her fiancé, J.H., moved to Florida.

{¶ 3} On May 18, 2022, the court adopted a parenting plan which included scheduled visitation between E.H. and R.T. On July 26, 2022, E.H. filed a motion for emergency custody and a motion for modification of custody of R.T., alleging a change of circumstances and requesting that the court designate E.H. as R.T.'s legal custodian.

{¶ 4} In February 2023, E.H. and J.H. moved back to Ohio. On February 8, 2023, E.H. filed a second motion for emergency custody of R.T. On November 3, 2023, E.H. and J.H. married. On December 14, 2023, E.H. filed yet another motion for emergency custody of R.T.

{¶ 5} The court held a hearing on March 11, 2024 on E.H.'s pending motions.[1] The juvenile court issued a journal entry on July 10, 2024, finding "a change of circumstances in the needs of the child and in her legal custodian since the Court's Order of May 18, 2022." The court terminated X.A.'s legal custody of R.T., granted legal custody of R.T. to E.H. and ordered parenting time to T.T. The court also granted X.A. "grandparent's time" with R.T. and found X.A. in contempt for "violations of [E.H.'s] parenting time."

---

[1] The hearing also concerned T.T.'s motion for legal custody of R.T., which the court denied. T.T. did not appeal this denial.

{¶ 6} X.A. appeals this order and raises two assignments of error for our review:

> I. The Trial Court abused its discretion by failing to acknowledge that the minor child, R.T. from her infancy, was determined to be neglected and dependent, and while Mother, E.H. still could petition for custody, Mother's parental rights waned as the rights of the child and the child['s] best interest became paramount, and that a change in circumstances of the child or the paternal grandmother, and that modification or termination of the order is necessary to serve the best interest of the child.

> II. The trial court abused its discretion by awarding sole legal custody to the Mother, with limited, 6 hours per month visitation to the paternal grandmother and former legal custodian on the Father's parenting time without applying the best interest factors.

## II. Hearing Testimony and Evidence

{¶ 7} The transcript of the March 11, 2024 hearing in this case, which was produced via "Digital Recording," begins at some unknown time after the start of the hearing. The first transcribed line is the court stating, "And let's identify them on the record first. Do them one at a time please." It is unclear to what the court is referring. The following testimony was presented.

### a. E.H.

{¶ 8} E.H. testified that a civil protection order from "the Summit County Court" was dismissed on February 6, 2023. Asked how her parenting time resumed in February 2023, E.H. replied, "Not very well." E.H. explained as follows: "I was supposed to have . . . every weekend I believe and it would have been like Friday and Saturday and then it would be the next week like Saturday to Sunday . . . ." E.H. testified that she was not getting "that parenting time" and she did not see R.T. until

November 2023. E.H. testified that she "was able to have weekend visitation once" during the summer of 2023.

{¶ 9} According to E.H., she "was supposed to have [R.T.] for the summer," but X.A. took R.T. to California in the summer of 2023. Asked what attempts she made "to contact [X.A.] about that," E.H. testified as follows: "I had tried to make arrangements for me to come to California to pick [R.T.] up but it was way to[o] expensive. [At the] last minute . . . I was given with no notice really that that is what I would be needing to do. And then when I was . . . speaking with . . . my lawyer and people within the Courts, I was told that it's not on me."

{¶ 10} E.H. testified that X.A. was in California for "months" and E.H. communicated by Zoom with R.T. every Tuesday and Friday. E.H. testified that X.A. was in California because X.A.'s grandmother "was ill, deathly ill and that she needed to be taken care of and could not be left alone."[2] E.H. learned that X.A. took R.T. to Mexico during this time. According to E.H., X.A. "notified me and sent me pictures of [R.T.] on the beach on a donkey." A "month or two" later, X.A. moved her grandmother to Ohio and returned here with R.T. E.H. testified that she "had to go to Court" to resume her parenting time with R.T. According to E.H., R.T.'s behaviors during her parenting time "were horrible. She was acting out. She was not wanting to do . . . visits, anytime I tried to get her to talk to her grandmother, it was a battle, she would say she didn't want to talk." E.H. testified that R.T. was

---

[2] E.H. testified that X.A. "calls her [grandmother] her mother but it's her grandmother. Her name is momita. It's a very confusing situation."

"confused . . . . She is very confused because I am trying to establish that I am her mother. And it is being told to her that other people are her mother and I feel like the whole situation is very confusing to a child that age."

{¶ 11} E.H. testified that R.T. was five years old in the fall of 2023 and the child was having issues with potty training.

> It has gotten to the point where she will go from playing in the yard and urinating on herself and letting it dry and not telling anybody. To at night time it got so bad to the point where we had to buy mattress covers to protect our mattresses from . . . getting ruined. Pillow cases. We had to throw away and replace blankets, . . . stuff[ed] animals. She was wearing diapers from what I know when she was with [X.A.]. [S]o she just expected to be put in diapers when she was with us. And at first I did . . . try to get her . . . to gradually move out of diapers.

{¶ 12} E.H. testified that she worked with R.T., who "was almost full blown potty trained by the time I sent her back" to X.A. after her parenting time in the fall of 2023. According to E.H., after R.T. was returned to X.A., E.H. "was kept from . . . seeing [R.T.] again." E.H. did not see R.T. again until January 2024, pursuant to an updated court order. Furthermore, E.H. was not able to talk to R.T. "on the phone or Zoom" prior to January 2024.

{¶ 13} E.H. and J.H. married in November 2023. E.H. tried to arrange with X.A. and T.T. to have R.T. "there for the wedding." According to E.H., X.A. told her that R.T. "didn't want to be there . . . and then [T.T.] notified me that he was working and couldn't do anything about it." E.H. testified that her wedding was held on a weekend when she was scheduled to have parenting time with R.T.

{¶ 14} E.H. testified that, since the court issued the "new order," parenting time "has gone amazing.[3] [R.T.] has been very happy to be back with us. She has been improving with the way she acts with us . . . especially towards her sister. She you know plays with her, she interacts with her, she is very nice with her." According to E.H., there were two instances since the "new order" when she missed parenting time with R.T. because X.A. "refused to show up at the" exchange location. E.H. notified the police about both incidents. Other times, X.A. was late bringing R.T. to the exchange location. E.H. testified as follows about one incident:

> February 23[, 2024] I was told at 5:51 that [X.A.] was going to be over an hour as I was already at the police station and when I asked where [R.T.] was and if I could get her. I was ignored. [X.A.] did not show up until eight o'clock and when she did show up I was in the middle of filing a police report. [X.A.] then became very agitated and an officer came out, asked [X.A.] to leave and she was refusing to leave the police station. So the officer then let her file a report to get her to sit down and be able to let me.
>
> . . .
>
> So the officer let [X.A.] file a report and I was told that I can go out to the car to take [R.T.] and then come back in and file my report.

According to E.H., "the officer had to walk me outside because [X.A.] was still waiting in the parking lot."

{¶ 15} E.H. testified that the first time she had R.T. in 2024, R.T. "was sent with a tracking device. An air tag which to my knowledge was put into a necklace to

---

[3] E.H.'s counsel also referred to the "new order" as the "January 5th order." E.H.'s counsel did not state the year in which the "new order" was issued. Nonetheless, according to the docket in this case, the court did not issue an order on "January 5th" of any year.

hide it because we had no idea it was there until our phones notified us of this air tag. And then when we couldn't find it we pressed the locate button which then made it beep." According to E.H., her concern with the air tag was that she "was told it was for school purposes but [R.T.] didn't have school that Friday. And it was still on her . . . . I was not notified of this tracking device being used for school purposes . . . so my main concern is how it slipped their minds." E.H. testified that she did not believe the air tag was "only used for school purposes" because T.T. told E.H. "that he uses [it] to check where [R.T.] is at while she is with [X.A.] which is concerning to me as to why that is needed."

{¶ 16} E.H. testified that R.T., who was almost six years old at the time of the hearing, was still not potty trained and her other child, who is approximately one year younger than R.T., has been potty trained since she was one year old.

{¶ 17} E.H. testified that she was ordered to take a hair follicle drug test in 2023 and X.A. was ordered to pay for this test. According to E.H., when she went for the test, "it was not paid for and there was nobody to do the hair follicle test." E.H. testified that she was able to get the drug test on March 29, but it was rejected "due to lab error." E.H. did take a urine drug test that she paid for herself and the results showed that she tested positive for marijuana and negative for all other substances. E.H. testified she had a medical marijuana card from Florida at that time and she uses medical marijuana "as instructed to assist with [her] ADHD."

{¶ 18} E.H. testified that, at the time of the hearing, she lived in a two-bedroom house with J.H., their child and R.T. when it was E.H.'s parenting time.

R.T. and the other child share a bedroom. E.H. testified that, if given custody of R.T., R.T. would go to Holy Family School. E.H. testified that J.H. works and she is a stay-at-home mom. E.H. and J.H. both have family members in northeast Ohio that help with the children when needed.

{¶ 19} E.H. testified about concerning incidents she had witnessed, either in person or on Zoom calls, involving X.A. since May 2022. According to E.H., X.A. would threaten to give R.T.'s cat away or to sell R.T.'s toys when R.T. would not respond to X.A. or when R.T. would refuse to call X.A. "mommy." E.H. testified that "there have been times where [X.A.] has been very nice and then within seconds switched over to being an angry very angry person towards me." For example, E.H. testified about an incident that happened in the fall of 2023:

> We went to the Barberton McDonald's to pick up [R.T.] and [X.A.] had shown up but she kept telling me that she was not going to give me the child. That the child didn't want to go with me. But [R.T.] was sitting there conversating with me, telling me she didn't want to go with me because [X.A.] had told her she could go to the trampoline park. So [R.T.] was visibly not wanting to come with me because she was promised something. So when I went to go get [R.T.] out of the car as I was instructed to do because the child has no say in visitations, to just pick her up and put her in my car. I was then pushed into [X.A.'s] vehicle by [X.A.] and she then grabbed me trying to . . . shove me into her car and violently shaking me which lead to bruises being left on my arms specifically finger marks and nail marks.

E.H. further testified that R.T., who was in the vehicle, "observed" the incident and E.H. did not get her parenting time that day.

{¶ 20} E.H. testified that when she was living in Florida in the summer of 2022, X.A. would send R.T. to visit E.H. "with candy" and "toys" in her bag.

According to E.H., R.T. had "oral hygiene issues" of which X.A. was aware. However, the medications that R.T. was allegedly supposed to take were not included in R.T.'s bag.

{¶ 21} Asked why she believed there had been a change in circumstances since the last custody order, E.H. testified as follows:

> Well what I worry about the constant going back and forth and the drop offs. The type of environment that it has been in numerous situations it's been hostile. I have been yelled at in front of [R.T.] and [R.T.] has apologized to me on behalf of [X.A.]. That is not something a child should have to do. It is a hostile environment. [X.A.] continues to have the child calling her mommy which is highly inappropriate. [X.A.] does not seem emotionally regulated properly which is concerning . . . which also affects [R.T.] because I have seen that in [R.T.] now because she grows up around it. I am worried about the people she's brought around. I am worried about the type of stuff that she watches on TV. She asked me the other night if she could watch Five Nights of Freddy. Why is a five year old trying to watch horror films? That is beyond me. [I]t comes down to simple things as potty training a child. You start that at a very young age and that has not been done clearly. There has [been] no time or effort put into it. I have been sent by [X.A.] pictures of [R.T.'s] bed where there are big dark yellow stains that you can tell have been over a course of a couple years. And she has tried to say that [R.T.] was potty trained and that I am the cause of this.

{¶ 22} E.H. testified that she has concerns about how R.T. yells at her. According to E.H., "[i]t signifies what she witnesses. How she is talked to and how she is going to talk to other people . . ., letting her know that it's okay behavior." E.H. testified that she believes the situation "would gradually get worse" if X.A. maintained custody of R.T.

{¶ 23} On cross-examination, E.H. testified that when Summit County Children Services investigated allegations against E.H. and J.H., she did not relay to

the agency her concerns about R.T.'s oral hygiene. E.H. testified that she had "eight weeks straight" visitation with R.T. in the summer of 2022. During this time, E.H. "fully potty trained" R.T. According to E.H., R.T. "regressed" when she went back to X.A.'s because the "training was not kept up . . . ."

{¶ 24} E.H. testified that she last worked in 2018 when she was pregnant with her second child. E.H. testified that she and J.H. moved to Florida because J.H. had family there and they wanted their child "to be surrounded by" this family. They lived with J.H.'s grandmother and his father for "three or four years." According to E.H., they moved back to Ohio in February 2023 because "the traveling back and forth" to see R.T. "was a bit too much . . . ." By April or May 2023, E.H. and J.H. were renting a home that E.H.'s parents owned.

{¶ 25} X.A.'s counsel asked E.H. about her testimony that X.A. sent R.T. to Florida in the summer of 2022 with "the candy bag." It was established that E.H. "asked that [R.T.] be sent with absolutely nothing" because E.H. "had the basic necessities" for R.T. X.A.'s counsel next asked about "the exact dates" that E.H. was "denied parenting time" by X.A. E.H. answered, "Well there are over twenty that I know about that we have written down but I can't off of the top of my head name every single one of them. I know that recently in December there was one on the 7th and the 15th as well . . . ." of 2023. According to E.H., X.A. "just did not show up" with R.T.

{¶ 26} Asked "[A]re there any issues with [R.T.'s] grades in school?" E.H. replied, "I am not communicated that . . . . I have not been notified where she goes

to school.  I have asked [T.T.] who has told me that I can find out on my own." E.H. testified that she also asked X.A. where R.T. went to school.  "I have communicated it very well on my part I would think as much as I can to try to find out where she goes to school."  E.H. testified about the issues she has "as it relates to the co-parenting arrangement" she has with X.A.:  "I would say that . . . communication is a hard thing to have when not all parties are willing to communicate . . . ." Asked if "all of the issues related to your parenting are predicated from [X.A.] only," E.H. answered, "I feel like [T.T.] also plays a part in it."

{¶ 27} E.H. testified that T.T.'s relationship with R.T. is "[v]ery important" and, in her opinion, "he should have every other weekend with her."  E.H. further testified that, in her opinion, X.A.'s "parenting" time "should be through the discretion of her son . . . .  I don't agree that given the circumstances and how many chances have been given, that there should be a set parenting time with the X.A. because she is a grandparent."

{¶ 28} X.A.'s counsel asked E.H. about "the time where you [and J.H.] were accused of the sexual abuse allegation" and the following colloquy occurred:

> Q:      And so those allegations you indicated in your testimony if I am correct, you said that you anticipated that correct?
>
> A:      Yes it was anticipated because [R.T.] had notified us that this was going to be happening.
>
> Q:      So it's your position that you believe that [R.T.] had told you that she was being coached or forced to make accusations against you?
>
> A:      Yes.
>
> Q:      What exactly did she say?

**A:** [R.T.] is in my vehicle and was telling us that, me and my husband, that grandma is trying to make me say that you did things to me. I don't know why.

**{¶ 29}** X.A.'s counsel next asked E.H. what she did "to try to get [R.T.] some outside help . . . ." E.H. replied, "I have actually reached out to numerous . . . mental health professionals, doctors, pediatricians and I have been told I cannot get her help because I don't have custody and there is nothing they can do." E.H. testified that she is aware that R.T. "has a therapist" but she did not reach out to this individual because she "was not let known who [R.T.'s] counselor was when [she] asked for that information."

**{¶ 30}** E.H. testified that during her "summer parenting time in 2023," X.A. took R.T. to California. According to E.H., X.A. told her that she went to California because X.A.'s grandmother was "deathly ill." E.H. further testified she learned that X.A.'s father passed away "and that is when most of the concerns for [X.A.'s] mental health came in." E.H. testified that R.T. is adjusting well to parenting time and it is E.H.'s intention to remain in Ohio permanently.

**{¶ 31}** On redirect-examination, E.H. testified that she did not receive her scheduled parenting time from October 23, 2022 to November 6, 2022, nor did she receive it from December 18, 2022 to December 31, 2022. According to E.H., she asked X.A. for "some parenting time" when she moved back to Ohio in early 2023 and "was told no." E.H. testified that she had no parenting time "between the fall of 2023 and when [the court] issued the order." It is unclear from the transcript to what order she is referring.

### b. Rachel Norman

{¶ 32} Rachel Norman ("Norman") testified on behalf of X.A. Norman testified that she works for KinderCare in Wadsworth as a teacher. In August 2022, she had R.T. as a student and would see her "two to three times a week." R.T. was four years old at the time. According to Norman, R.T. "was always kind" and she was "confident." R.T. did not have problems with the other children and she "always play[ed] very kindly." Norman testified that X.A. was the "caregiver or custodian" of R.T. at the time that R.T. was Norman's student. X.A. "instructed" Norman "to write incident reports if [Norman] ever heard anything."

{¶ 33} In August 2022, R.T. disclosed to Norman "that [E.H.] put needles in her peepee, was the words she used . . . and that she didn't like it." Norman testified as follows about the "setting" of the disclosure:

> Yeah we were doing an activity, I don't remember the activity that we were doing but we were sitting at the table. It was [R.T.] and another child and she started telling me that and I asked the other child to leave the table at that time. And she finished what she told me and then I immediately went and wrote it on an incident report and at the end of the night I had [X.A.] sign that and gave it to my manager.

{¶ 34} Norman testified that R.T. had not been in school for "most of the summer" in 2022. R.T. returned in August 2022, and this incident happened "maybe a week after she returned." Norman further testified that she gave the report to X.A. to sign and then she gave it to her manager. According to Norman, it is her duty to report incidents to her manager, and she did this, but she did not report the incident to the Medina County Children Services because "the managers decide

where the information goes, what needs to be done with that with those reports." Norman testified that she had no concerns about R.T. while she was in X.A.'s care.

{¶ 35} On cross-examination, Norman admitted that she had never observed X.A. caring for R.T. E.H.'s attorney asked Norman when X.A. told Norman to "start making incident reports if [R.T.] said something." Norman answered, "[T]he morning that [R.T.] told me what had happened to her." Asked if "[t]hat was never your policy beforehand," Norman replied, "It was always our policy." Norman testified that after she "reported it" to her manager and X.A., she did not "do any follow up" regarding this incident and she was never "contacted by any other children services provider."

### c. Saila Shelly

{¶ 36} Saila Shelly ("Shelly") testified that, in August 2022, she was employed as a teacher at KinderCare Learning Centers and R.T. was in the pre-k classroom at the time. Asked if R.T. made a disclosure, Shelly answered as follows: "I was told by [R.T.] that she had an incident regarding something that happened with [E.H.] [R.T.] disclosed to me that [E.H.] had needles put in her private area." Shelly filed an incident report and notified her director. Shelly testified that she was unsure what happened after this, she did not recall "any follow up" and she was not contacted by anyone from Medina County.

{¶ 37} Shelly testified as follows about the details of the disclosure:

> Yeah so she came in and she was a little groggy again it was very early in the morning and she was wrapped up in a blanket and it is our policy that we are not allowed to have . . . the children's blankets out around like our toys and stuff. We have to have them in a cubby so I asked to

take the blanket from her . . . and she said that she wasn't feeling well and that she wanted to keep it. And I asked what was wrong and that is when[] she disclosed it to me.

{¶ 38} On cross-examination, E.H.'s attorney asked Shelly if X.A. requested that Shelly write incident reports. Shelly answered, "Um . . . potentially but I don't recall."

### d. Thomas Sconiers

{¶ 39} Thomas Sconiers ("Sconiers") testified that he is a detective with the Barberton Police Department. According to Sconiers, in October 2022, X.A. filed a "sexual assault report" concerning R.T. Sconiers testified that the "report was ultimately referred down to Florida where the incident allegedly took place." Asked if he investigated the allegation, Sconiers answered, "We did not. We . . . got some contact information for children services and all that was forwarded to Florida since that is where the incident took place."

{¶ 40} Sconiers testified that he told X.A. "if it was my child and these were the allegations that were brought up, I would hold on to the child until I am able to talk to a lawyer and the Courts." Asked what was reported to him by X.A., Sconiers read the following from the police report that he authored:

> [X.A.] stated [R.T.] informed her the private area was hurt because [E.H.] placed needles in her peepee. . . . I was also informed that a similar report was filed with KinderCare telling the workers that [E.H.] stuck needles in her peepee. . . . [W]hat was also relayed to me was [J.H.] would place whip cream on his genitalia and make [R.T.] lick it off. And [X.A.] stated [R.T.] also told her she would be placed in a dog cage when she was bad.

**{¶ 41}** Sconiers testified that he never spoke with R.T., he never spoke with E.H. and he never received "any reports from Hillsboro," which is the "jurisdiction" in Florida where the incidents allegedly took place. Asked if it would "surprise" him that no charges were filed as a result of these allegations, Sconiers answered, "I can't really speak on that."

**{¶ 42}** Under cross-examination, Sconiers testified that X.A.'s initial police report was filed on October 20, 2022, and X.A. filed an "addendum" on November 2, 2022. According to Sconiers, in the addendum, X.A. reported that E.H. "is in Ohio attempting to take [R.T.] for visitation."

### e. X.A.

**{¶ 43}** X.A. testified that, at the time of the hearing, she was the legal custodian of R.T. According to the May 18, 2022 agreement between the parties, E.H. had parenting time and X.A. had "responsibilities." X.A. testified that she understood her responsibilities and she "intend[ed] to be bound by that agreement." X.A.'s attorney did not ask her what the responsibilities were.

**{¶ 44}** X.A. testified that, according to the agreement, E.H. "would have eight weeks in June of 2022" of parenting time. Asked where R.T. was "for that time period," X.A. answered, "With [E.H.]." X.A. next testified that E.H. received her parenting time per the agreement on several occasions.

**{¶ 45}** According to X.A., R.T. disclosed allegations "about something sexual" after being at E.H.'s in Florida for "[f]our weeks, eight weeks" in the summer of 2022. X.A. testified that, the day R.T. got back from her summer of 2022

visitation with E.H., the following occurred when R.T. was in the bathroom at Walmart:

> A: [W]hen I was going in there, she was finishing up I was going to wipe her . . . she tell me mommy, don't do it too hard and I was like what do you mean too hard. She go don't wipe me too hard. And I asked her why so that's when she started . . . explaining to me what happened in Florida and I freak out.
>
> . . .
>
> . . . I ask her . . . why don't you want me to wipe too hard, she go because my peepee hurts. I say why your peepee hurt, she goes because [E.H.] stick needles in my peepee. I said why and she say I don't know but I was screaming when she was doing it. So at that moment I feel like . . . maybe cold water in my body. So I don't know what to do. . . .

{¶ 46} X.A. testified that she took R.T. to an emergency room in Barberton and then to Akron Children's Hospital and she took R.T. to "child services." X.A. testified that she told E.H. she "was not going to let [R.T.] go" to visitation with E.H. on October 23, 2022, "because of what happens to her. And . . . I was afraid . . . for [R.T.]." X.A. then reported the allegations to the police. X.A. testified that she "was just scared for [R.T.] because I know [it] was not really the mother was doing things but her stepdad."

{¶ 47} According to X.A., R.T. "was potty trained before a year old. [R.T.] was potty trained from the time she went with [E.H.], she was not given underwear, she was not using diapers." X.A. testified that after R.T. "come back from Florida [she] started peeing the bed."

{¶ 48} X.A. testified that she filed a protection order against E.H. and the court granted the "temporary ex parte order." X.A. agreed that the order was dismissed.

{¶ 49} X.A. next testified about the "March 27, 2023 order . . . from this Court." This journal entry states as follows regarding the aforementioned protection order: "[X.A.] filed a Domestic Violence Civil Protection Order in Summit County against [E.H.] DR-2022-11-3015 alleging sexual misconduct and assault which was dismissed on February 7, 2023 at the Evidentiary Hearing." This order further states that E.H. "was not permitted her normal visitation" and allowed "partial makeup" visitation from March 30, 2023 to April 26, 2023. X.A. testified that E.H. received this parenting time.

{¶ 50} X.A. testified that her father passed away in April 2023 and that he and her mother lived in California.[4] According to X.A., she went to California to help her mother sell her house and move her to Ohio. X.A. testified that she was in California from April to July 2023. At the time of E.H.'s next scheduled visitation with R.T., X.A. texted E.H. that X.A. was in California and E.H. could come there to pick up R.T. X.A. testified that E.H. agreed to this but the day before E.H. "was supposed to be in California to pick up" R.T., E.H. said to X.A. that she was not coming to California. Rather, E.H. was filing "for contempt of Court because [X.A.] was not giving" R.T. to her.

---

[4] Although X.A. refers to her "father" and "dad" and "mother," these persons are actually the grandparents of X.A.

{¶ 51} X.A. testified that E.H. was scheduled to have eight weeks of parenting time with R.T. starting on June 1, 2023. X.A. testified that R.T. "was not with me [in California] the whole time because I had to bring her back so [E.H.] could take her."

{¶ 52} X.A. testified that she was in court in January 2024, and "there was an order" that included parenting time for E.H. every weekend "from Friday at six o'clock to Sunday at six o'clock." According to X.A., this parenting time has been "good."

{¶ 53} Asked what concerns X.A. had when R.T. was in E.H.'s care, X.A. testified as follows:

> I have a lot of concerns. . . . [O]ne of them . . . is drugs. In my house [R.T.] never see a drug. Never see somebody smoking in front of her. Uh when [R.T.] come back I hear she say this person smoke this. She said this person packed this.
>
> . . .
>
> Friday I pick [R.T.] up . . . from her mother's in the police station.
>
> . . .
>
> She said [E.H.] had this pipe and she put something on it and she said pack it. Pack it and then she light it and smoke it.
>
> . . .
>
> Another concern is [E.H.] tell [R.T.] don't eat a lot of food because she is going to get fat like me and she going to die. So she been telling me she don't want me to die. So she tell me don't eat a lot and the baby don't want to eat anymore.

{¶ 54} X.A. further testified that she is "Spanish" and she is teaching R.T. Spanish. According to X.A., E.H. told R.T. that she does not want R.T. "learning

Spanish because that is not her language." X.A. further testified that her own grandmother raised her and she referred to her as "mother." X.A. stated, "And it hurts me when [R.T.] come to me and tell me mommy [E.H.] say you are not my mommy."

{¶ 55} X.A. testified that she is "able to continue" the May 18, 2022 parenting plan.

{¶ 56} On cross-examination, X.A. established that when R.T. "returned from her summer parenting time" in 2022 with E.H., the parties "were already in Court" on pending motions. E.H.'s attorney asked X.A. if, in August 2022, she brought up the allegations of sexual abuse at any of the hearings. X.A. answered, "I don't remember." E.H.'s attorney asked again and X.A. said, "No" and "I don't remember." E.H.'s attorney specifically asked if X.A. remembered "the domestic violence civil protection order hearing." X.A. answered, "Yes." E.H.'s attorney asked if X.A. remembered bringing "an after visit summary from August 1, 2022" concerning R.T. to this hearing. X.A. answered, "Yes I did." The following colloquy ensued:

Q:     Do you remember that the after visit summary from August 1, 2022 related to [R.T.] having dandruff?

A:     Dandruff?

Q:     Yes.

A:     No she don't have no dandruff. She had lice when she come back.

Q:     Oh so she came back from Florida with lice?

A:     Yes.

. . .

Q:      Do you recognize that document?

A:      Yeah the doctor the same day I took [R.T.] to the emergency room.

Q:      And that is from August 1, 2022 correct?

A:      Yes.

Q:      Okay.  And that's in regards to [R.T.]?

A:      Yes.

Q:      Okay.  I am just going to approach really quick and direct your attention to . . . the diagnoses.  Does it say dandruff?

A:      Oh yeah that's the day . . . because she had something in her hair that day and I told the doctor what was it, and he said that was dandruff.

. . .

Q:      The only diagnosis from this visit was as it relates to her dandruff correct?

A:      Yeah . . . .

{¶ 57} X.A. testified that the hospital was supposed to schedule follow-up appointments for R.T. concerning the sexual-abuse allegations but she had no "medical records" or other evidence to support this.  E.H.'s attorney asked X.A. if she filed "anything with the Court to suspend the parenting time" after August 2022 in light of the sexual abuse allegations.  X.A. answered, "No."

{¶ 58} E.H.'s attorney asked X.A. if she told the "day care workers . . . specifically to write down anything R.T. said."  X.A. answered, "Yes I did . . . ."  The cross-examination continued:

Q:      You told her to do it because you told [R.T] to tell those day care workers something correct?

A:      No.

. . .

Q:      So it just happened to be the day that you told the day care workers to make sure to write down any incident reports, she made a disclosure to the day care worker correct?

A:      Yes every day I was dropping [R.T.] I was telling the teachers if something happens just document everything.

Q:      That's not what the day care worker said.

A:      Because I know how mother is.

{¶ 59} X.A. admitted that, despite the alleged abuse and R.T.'s disclosure occurring in the summer of 2022, X.A. did not inform the police until October 2022, two days before E.H. was scheduled for parenting time.  After the police forwarded the investigation to Florida, where the abuse allegedly occurred, X.A. filed a civil protection order that barred E.H. from seeing R.T. "for several months."  Ultimately, X.A. agreed that "there was no finding of sexual abuse."

{¶ 60} Additionally, X.A. admitted that, despite knowing E.H. had scheduled parenting time starting on June 1, 2023, she took R.T. to California with her.  X.A. testified that her "dad died and [she] had to leave and it was like an emergency."  E.H.'s attorney asked X.A. that if her father died in April 2023, "it wasn't that big of an emergency."  X.A. answered, "Yes."  X.A. then "expected" E.H. to come to California to pick up R.T.  X.A. also admitted that, from California, she took R.T. to Mexico during E.H.'s parenting time in the summer of 2023.

Ultimately, X.A. agreed that she "did not allow [E.H.] to see [R.T.] at all between the time her extended parenting time ended . . . until [the court] issued the order in January."

### f. Guardian ad Litem ("GAL")

{¶ 61} According to the GAL, when R.T. was born, the parents "were both teenagers and it was apparent through that initial case that they were not ready to parent." E.H. and T.T. agreed that X.A. would be R.T.'s legal custodian. The GAL stated that, at the time, X.A. "was individually meeting [R.T.'s] needs." The GAL also stated that E.H. and T.T "went on with their lives." When E.H. wanted to have parenting time, "there was a lot of litigation." An agreement was reached in May 2022 that X.A. would remain as legal custodian, T.T.'s "visitation would flow through" X.A. and E.H. would have parenting time. The GAL stated that "[t]here were problems with the virtual visits. There were problems with the in person visits. It didn't work as smooth as it was intended to work."

{¶ 62} According to the GAL, she filed a report in May 2023 recommending "that the order should remain as is" and E.H. "should be afforded make up time." The GAL noted that the parties should follow the court order and "if particularly [X.A.] was not going to follow this order that possibly that you know would change the circumstances, as the legal custodian if you are not going to follow the order, then custody can . . . change." The GAL stated that she did not understand why X.A.'s "continued practice" was that E.H. "didn't get her parenting time" and the GAL "was shocked that it was one thing after another after another after another."

According to the GAL, if X.A. "believed that the child was harmed, truly harmed, then of course she should act." The GAL stated that "the way things developed didn't seem to make sense. You know if the child was sexually abused or physically abused as was stated there are pins placed in her you know vagina. I mean this is horrific. There would be some indication . . . ."

{¶ 63} The GAL's statements continued as follows:

> I went to [E.H.'s] home it was [A]ugust 7th, it was the Barberton home and [X.A.] was present, one of her daughters . . . was present. [T.T.] was there as well. And the child . . . came from another room walked over to me and said oh my mom did this. Like she was telling me the porch pot blew off the step which was quite suspicious. [R.T.] herself looked fine. No issues no problems. This was literally [A]ugust 7th. So did [R.T.] make disclosures yes but it was almost kind of robotic. Like I am going to tell you which was odd she doesn't see me that often and in a child that age one would have to in my experience bring out, not just say it like that. . . . To say that she was telling everyone this in August which is very odd. [A]nd then there is no follow up . . . I would think [X.A.] knowing her for this long would have ensured that [R.T.'s] wellbeing and physical health needs were met. And I don't know that what happened in my opinion supports that. . . . [T]he way this was utilized was suspicious. Also [E.H.] and [J.H.] as the court is aware they have a daughter who is four years old. That child is healthy and well. There ha[ve] never been any issues or concerns with that child. She is meeting her or exceeding her developmental milestones. She is doing very well.

{¶ 64} The GAL stated that X.A.'s "actions" concerning the "domestic violence protection order and making the same or similar physical or sexual allegations was very disturbing . . . ." In the GAL's opinion, X.A. "is no fan of" E.H. The GAL stated that X.A. is "upset and resentful" that E.H. "came back into [R.T.'s] life after being absent for some four years." The GAL acknowledged that X.A. "sacrificed a lot of her life and took the place of the parents when they couldn't or

would not so I honor [X.A.] and there is no disrespect." But, according to the GAL, a legal custodian "still has responsibilities" and "what everyone needed to do was follow the [court] order." The GAL stated that "[m]ore parenting time was missed th[a]n was allowed for one reason or another and that is very unfortunate."

{¶ 65} According to the GAL, X.A. "was of the mind and she has expressed [that] it was more like an adoption. This is my child now. [E.H.] is gone and [T.T.'s] relationship will be what I want it to be when I want it to be . . . ." The GAL stated that it is "necessary" for R.T. to have a good relationship with her biological parents and siblings and "the parents cannot be subject to investigations and allegations that could ruin someone['s] life. [J.H.] was asserted to be a child molester, a pedophile, he was called that. I mean . . . that will ruin one's life." The GAL said that she did not believe X.A. "has the capacity to welcome . . . and facilitate" that J.H. "would play an active role" in R.T.'s life.

{¶ 66} The GAL stated that, given R.T.'s age of "almost six," the "toileting issue" is "concerning." R.T. has said that X.A. "puts diapers on her. She lets her wear diapers." The GAL stated that "is not okay and that is not something that should be allowed." According to the GAL, R.T. "has hygiene issues" and "[b]rushing her teeth . . . need[s] to be explored as to why is that happening and why is that tolerated at this advanced age. It is quite disturbing."

{¶ 67} The GAL stated that her "recommendation has changed" and it is in R.T.'s "best interest [that E.H.] should be designated legal custodian." According to the GAL, E.H. "has proved her parenting by parenting." The GAL further stated that

T.T. should "have a court order parenting time schedule." The GAL stated that X.A. is the "struggle" and, although the GAL had "great respect" for the "life sacrifice" that X.A. made, "what's been created is . . . almost poison."

{¶ 68} The GAL filed a report with the court on March 4, 2024, which was consistent with the statements she made in court. The GAL's written recommendation was as follows:

> Pursuant to investigation of this matter, this GAL is recommending that [E.H.] be granted Legal Custody and Residential Parent status of [R.T.], as in her best interest.
>
> [T.T.] should have a Standard Plan of access and visitation to [R.T.].
>
> [X.A.'s] future access and visitation should be limited to Grandparent Companionship time.

## III. The Juvenile Court's Journal Entry

{¶ 69} The juvenile court issued a judgment entry on July 10, 2024, which states, in part, as follows:

> The Court discounts much of the testimony and allegations of [X.A.]. The Court finds [X.A.] purposely disrupted [E.H.'s] parenting time and did cause [R.T.] to refer to [X.A.] as "Mother."
>
> The Court finds [X.A.] will attempt to allude or not follow or disobey Court Orders in regards to parenting time.
>
> The Court believes that [T.T.] is not in a position to have custody of [R.T.] as the residential parent.
>
> The Court finds there has been a change of circumstances in the needs of the child and in her legal custodian since the Court's Order of May 18, 2022.
>
> [R.T.'s] parents have matured and become responsible. [X.A.], who has raised and supported [R.T.], appears to feel she has adopted [R.T.] and is not [R.T.'s] legal custodian and can dictate parenting time.

[X.A.] wants to dominate and control parenting time, and health care or the lack of it, and be [R.T.'s] mother. This is not in [R.T.'s] best interest. [X.A.] has not acted in [R.T.'s] best interest in ignoring or being lax in hygiene and oral hygiene issues in the past.

It is time for [X.A.] to become [R.T.'s] grandmother. The Court finds it is in [R.T.'s] best interest that [E.H.] be designated [R.T.'s] legal custodian and residential parent for school. That [T.T.] be awarded parenting time with [R.T.]. That [X.A.] be granted grandparent's time through her son, [T.T.'s] parenting time and at [T.T.'s] discretion. [X.A.'s] companionship time should be no less than one six (6) hour block a month on Saturday or Sunday or at a time mutually agreed between [T.T.] and [X.A.].

{¶ 70} The court terminated X.A.'s legal custody of R.T. and granted E.H. legal custody of R.T.

## IV. Law and Analysis

{¶ 71} For ease of discussion, and because X.A.'s arguments are interrelated, we review her two assignments of error together.

### a. Standard of Review

{¶ 72} Appellate courts review a juvenile court's order regarding legal custody of a child under an abuse-of-discretion standard. *In re C.D.Y.*, 2019-Ohio-4987, ¶ 8 (8th Dist.). An abuse of discretion occurs when a court exercises its judgment "in an unwarranted way in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

### b. Modification of Legal Custody

{¶ 73} The Ohio Supreme Court has "acknowledge[d] that the Constitutions of both the United States and the state of Ohio afford parents a fundamental right to custody of their children." *In re James*, 2007-Ohio-2335, ¶ 16.

{¶ 74} R.C. 2151.23(A)(2) grants the juvenile court jurisdiction "to determine the custody of any child not a ward of another court of this state . . . ." Pursuant to R.C. 2151.011(B)(21), "Legal custody" of a child is

> a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.

{¶ 75} Pursuant to R.C. 2151.011(B)(50):

> "Residual parental rights, privileges, and responsibilities" means those rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child, including, but not necessarily limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support.

The Ohio Supreme Court has held that granting legal custody of a child to a nonparent "does not divest parents of residual parental rights, privileges, and responsibilities." *In re C.R.,* 2006-Ohio-1191, ¶ 21.

{¶ 76} In considering whether to modify custody and return a child to his or her parent or parents, courts turn to R.C. 2151.42(B), which states, in part, as follows:

> An order . . . granting legal custody of a child to a person is intended to be permanent in nature. A court shall not modify or terminate an order granting legal custody of a child unless it finds, based on facts that have arisen since the order was issued or that were unknown to the court at that time, that a change has occurred in the circumstances of the child or the person who was granted legal custody, and that modification or termination of the order is necessary to serve the best interest of the child.

{¶ 77} Courts determining what is in the best interest of a child must take into consideration the following factors:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency . . . .

. . .

R.C. 2151.414(D)(1)(a)-(d).

{¶ 78} Additionally, pursuant to R.C. 2151.23(F)(1), the "juvenile court shall exercise its jurisdiction in child custody matters in accordance with [R.C.] 3109.04 . . . ." R.C. 3109.04(F)(1) guides courts in determining the "best interest of a child," and it states, in part, that "the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

. . .

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The [party] more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

. . .

(h) Whether [any party] or any member of the household of [any party] previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether [any party], in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; . . .

(i) Whether [any party] has continuously and willfully denied the other [party's] right to parenting time in accordance with an order of the court;

(j) Whether [any party] has established a residence, or is planning to establish a residence, outside this state.

{¶ 79} Succinctly put, Ohio law "requires a court to find that a 'change has occurred in the circumstances of the child or the person who was granted legal custody' and that modification is in the best interest of the child before modifying an order granting legal custody." *Fisher v. Hasenjager*, 2007-Ohio-5589, ¶ 35, quoting *In re James*, 2007-Ohio-2335, ¶ 26.

### c. Analysis

#### i. Change in Circumstances

{¶ 80} In *In re S.M.T.*, 2012-Ohio-1745, ¶ 7 (8th Dist.), this court held that "[i]t is beyond question that a custodial parent's interference with visitation by a noncustodial parent may be considered a change of circumstances that would allow

for a modification of custody." The *In re S.M.T.* Court further held that "[i]nterference with visitation is particularly aggravating when the custodial parent willfully ignores a visitation order and obstructs the child's visits with the noncustodial parent." *Id.* at ¶ 8. *See also Jackson v. Herron*, 2005-Ohio-4046, ¶ 26 (11th Dist.) ("It is well-established that interference with the noncustodial parent's visitation rights may constitute a change of circumstances warranting a change of custody.").

{¶ 81} In *In re N.W., 2024-Ohio-2104* (6th Dist.), the court applied this law — regarding a parent's interference with visitation — to a grandmother who interfered with a father's visitation rights. "Grandmother's interference with Father's visitation rights may constitute a change in circumstances as described in R.C. 2151.42 for the modification of a legal custody order . . . ." *Id.* at ¶ 12.

{¶ 82} In this case, there is abundant evidence in the record that X.A. interfered with E.H.'s parenting time. Indeed, the GAL stated at the hearing that more parenting time was missed than was allowed, and X.A. admitted to withholding R.T. from visitation with E.H. on multiple occasions. The most egregious example of interference occurred when X.A. took R.T. out of the state and out of the country from April – July 2023 when E.T. was scheduled to have R.T. "for the summer" of 2023. Additionally, upon their return to Ohio, X.A. withheld R.T. from E.H.'s parenting time until November 2023, based on allegations that the juvenile court "discounted," the child services agency rendered unsubstantiated and the GAL found to be suspect. Accordingly, we find that the court acted within its

discretion when it found a change in circumstances since the court's May 18, 2022 order.

### ii. Best Interest of R.T.

{¶ 83} The following is a review of the evidence presented at the March 11, 2024 hearing that relates to the statutory best-interest factors that are relevant to R.T.

### 1. R.C. 2151.414(D)(1)(a)-(d) Factors

{¶ 84} R.C. 2151.414(D)(1)(a) concerns the relationship between R.T. and members of her family. Testimony and evidence in the record show that R.T. has a good relationship with her family members from both the maternal and paternal sides. Extended family is available on both sides to help care for R.T., and she has a younger sibling on each side of her family. The GAL's report states that R.T. "appears to have a positive relationship with [X.A.] and [T.T.]. [R.T.] also appears to enjoy the parenting time spent with [E.H.]" and her "sister and stepfather."

{¶ 85} R.C. 2151.414(D)(1)(b) concerns R.T.'s wishes, as expressed through her GAL. The GAL's report states that R.T. "is not able to fully understand the complexities of this litigation or to express her desire as to her future child custody status due to her tender age." The GAL recommended that E.H. "be granted Legal Custody and Residential Parent status of [R.T.], as in her best interest."

{¶ 86} R.C. 2151.414(D)(1)(c) concerns R.T.'s custodial history. Evidence in the record shows that R.T. had been in the custody of X.A. since she was one week old. T.T. spent time with R.T. while she was in X.A.'s custody. E.H. began formal

scheduled visitations with R.T. per the May 2022 court order when R.T. was four years old, although X.A. interfered with much of E.H.'s scheduled parenting time.

{¶ 87} R.C. 2151.414(D)(1)(d) concerns R.T.'s need for a legally secure permanent placement. The Ohio Revised Code does not define "legally secure permanent placement," but Ohio courts "have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). The GAL reported that both X.A. and E.H. were able to provide homes that are "appropriate to meet the needs of the family."

## 2. R.C. 3109.04(F)(1) Factors

{¶ 88} R.C. 3109.04(F)(1)(a) concerns the wishes of the child's parents. E.H. testified about numerous "concerning incidents" that she witnessed involving X.A.'s custody of R.T. Asked if she wanted to be R.T.'s legal custodian, E.H. answered, "Yes." E.H. also testified that R.T.'s relationship with T.T. was "very important." T.T., who is not a party to this appeal, expressed to the court that he should be R.T.'s legal custodian or, in the alternative, that his mother, X.A., "does a fine job at doing it herself."

{¶ 89} R.C. 3109.04(F)(1)(d) concerns the child's adjustment to home, school and community. Evidence in the record shows that R.T. had issues with bladder control and oral hygiene during E.H.'s parenting time. E.H. testified that the "whole situation is very confusing" to R.T. E.H. and X.A. appeared to blame each other for these issues. Two teachers from R.T.'s day care testified. The first testified that R.T. was "kind" and "confident" and that R.T. had no problems with the other

children. Both teachers testified that R.T. disclosed sexual-abuse allegations to them. However, evidence in the record suggests that there is no truth behind these allegations.

{¶ 90} R.C. 3109.04(F)(1)(e) concerns the "mental and physical health of all persons involved in the situation . . . ." The court, in its judgment entry, "discount[ed] much of the testimony and allegations of" X.A. and found that X.A. "will attempt to allude or not follow or obey" the parenting time order. The court also found that X.A. "did cause [R.T.] to refer to her as 'Mother.'" The GAL stated that X.A. was "upset and resentful" about E.H. coming back into R.T.'s life and that X.A. considered R.T her child. The GAL further states that X.A. does not have the "capacity to welcome" J.H. into R.T.'s life as her stepfather. The GAL also attributed R.T.'s lack of potty training to X.A. providing her diapers when she was five years old. Finally, the GAL referred to X.A.'s handling of this situation as "poison."

{¶ 91} R.C. 3109.04(F)(1)(f) concerns the party more likely to honor the visitation schedule. The record is replete with examples of X.A. not honoring the visitation schedule, and the court found that X.A. would likely not follow the schedule. There is no evidence in the record that E.H. failed to honor the visitation schedule.

{¶ 92} R.C. 3109.04(F)(1)(h) concerns whether any party or household member has been involved in a case in which a child was adjudicated abused or neglected. X.A. received legal custody of R.T. because R.T. was adjudicated dependent. Documents related to this adjudication are not part of the record on

appeal. However, this subsection refers to children who are adjudicated abused or neglected. It does not refer to children who are adjudicated dependent.

{¶ 93} R.C. 3109.04(F)(1)(i) concerns whether any party "has continuously and willfully denied the other [party's] right to parenting time in accordance with an order of the court . . . ." The record is replete with examples of X.A. continuously and willfully denying E.H. parenting time with R.T., and the court found that X.A. would likely not obey its orders. Additionally, the court found, by clear and convincing evidence, that X.A. was in contempt of court.

{¶ 94} R.C. 3109.04(F)(1)(j) concerns whether any party has established, or plans to establish, a residence out of state. E.H. testified that it was her intention to permanently reside in Ohio. X.A. did not testify about this issue, although it is undisputed that she took R.T. out of state and out of the country during E.H.'s parenting time in the summer of 2023.

{¶ 95} Upon review of the evidence and testimony presented at the March 11, 2024 hearing, we find that the court acted within its discretion when it found that it was in R.T.'s best interest to grant legal custody of the child to E.H. *See Davis v. Flickinger,* 77 Ohio St.3d 415, 419 (1997) ("[T]he best interest of a child encompasses not only the home environment, but also the involvement of both parents . . . . When one parent begins to cut out another parent . . . the best interest of the child is materially affected."); *In re K.D.,* 2017-Ohio-4161, ¶ 24, 27 (9th Dist.) ("The critical inquiry before awarding legal custody is to consider the current parenting abilities of each potential custodian and to determine whether it is in the best interest of the

child to be placed in the legal custody of any of them. . . . It is generally understood that it is in a child's best interest to have companionship with both parents.").

{¶ 96} Accordingly, X.A.'s two assignments of error are overruled.

{¶ 97} Judgment affirmed.

It is ordered that the appellee recover from the appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

EMANUELLA D. GROVES, J., and
DEENA R. CALABRESE, J., CONCUR